# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JOHN KNOLL**

        **Plaintiff,**

    **v.**                           **Case No. 04-C-1122**

**JO ANNE B. BARNHART**
**Commissioner of the Social Security Administration**
                **Defendant.**

---

## DECISION AND ORDER

Plaintiff John Knoll applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, claiming that he was unable to work due to a bad back. His claim was denied initially and on reconsideration, and by an Administrative Law Judge ("ALJ") after a hearing. He requested review by the Appeals Council, but that request was also denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). See Indoranto v. Barnhart, 374 F.3d 470, 473 (7th Cir. 2004). Plaintiff now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

## I.  APPLICABLE LEGAL STANDARDS

### A.    Disability Standard

In order to obtain disability benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. <u>See</u> 20 C.F.R. §§ 404.1520; 416.920. Under this test, the ALJ must determine:

(1)     Whether the claimant is engaged in substantial gainful activity ("SGA");

(2)     If not, whether the claimant has a severe impairment;

(3)     If so, whether the claimant's impairment meets or equals one of the impairments listed in SSA regulations as being presumptively disabling;

(4)     If not, whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work; and

(5)     If not, whether the claimant can make the adjustment to other work.

<u>Young v. Barnhart</u>, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that the claimant is not disabled. If the claimant reaches step 5, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. <u>Zurawski v. Halter</u>, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the SSA may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or

2

mental, postural, sensory or skin impairments) might substantially reduce the claimant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although he may use the Grid as a "framework" for making a decision. Elbert v. Barnhart, 335 F. Supp. 2d 892, 895 (E.D. Wis. 2004).

**B.     Standard of Review of ALJ's Decision**

Under § 405(g), the district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the scope of the court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. Id. Substantial evidence may be less than the weight of the evidence, but more than a scintilla, id., and is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. Young v. Sec'y of Health & Human Servs., 957 F.2d 386, 388-89 (7th Cir. 1992). Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. See Richardson, 402 U.S. at 399-400. A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). Where conflicting evidence would allow reasonable minds to differ as to whether

3

a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997).

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. <u>Id.</u> The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. <u>Rohan v. Chater</u>, 98 F.3d 966, 971 (7th Cir. 1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. <u>Zurawski</u>, 245 F.3d at 889. Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge between the evidence and the result. <u>Hodes v. Apfel</u>, 61 F. Supp. 2d 798, 806 (N.D. Ill. 1999) (citing <u>Sarchet v. Chater</u>, 78 F.3d 305, 307 (1996)).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Administrative Decisions

Plaintiff applied for benefits on April 9, 2001, alleging inability to work since September 10, 2000. (Tr. at 79.) His claim was denied initially on August 1, 2001 (Tr. at 61) and on reconsideration on November 20, 2001 (Tr. at 68). Plaintiff requested a hearing (Tr. at 72), and on November 5, 2002, he appeared with counsel before ALJ Dale Garwal (Tr. at 38).[1]

---

[1]Plaintiff appeared pro se on September 4, 2002, and the ALJ adjourned the hearing so plaintiff could retain counsel. (Tr. at 29-36.)

4

**B.     Hearing Testimony**

Plaintiff testified that he was 53 years old (Tr. at 50) and had worked as a welder all of his life.  He stated that his job required him to lift up to 45 pounds, 25 pounds frequently.  (Tr. at 45.)  The job also required him to crawl, climb and kneel.  (Tr. at 46.)

Plaintiff testified that he became disabled as of September 10, 2000 – the date he was terminated from his job because he was working too slowly due to his back pain.  (Tr. at 43-44.)  He indicated that he experienced back pain since age 18 and that in 1995 he underwent an MRI, which revealed degenerative disc disease.  He underwent therapy, which did him no good, then obtained medication, which eased the pain.  (Tr. at 44.)  He stated that as he got older the pain got worse.  (Tr. at 44.)  He said that he did not regularly see a doctor because he could not afford to.  (Tr. at 51.)

Plaintiff stated that he had pain in his lower back that ran down his legs to his feet.  He also stated that he had recently experienced pain in his neck when lifting.  (Tr. at 46.)  He testified that the back pain was constant and varied from moderate to severe.  (Tr. at 51.)  He stated that he had not discussed surgery with his doctors, that none of the therapy helped, and that he did not do anything particular himself to relieve the pain.  (Tr. at 52.)

Plaintiff testified that he could sit for 35 to 40 minutes, stand for about 70 minutes, lift about 15 pounds, and walk possibly two or three blocks.  He stated that his doctor had restricted him from lifting, twisting and bending.  (Tr. at 47-48, 50.)  He said that he sometimes had trouble sleeping and awoke with back pain.  (Tr. at 52.)  He stated that he had no trouble with his hands and could climb short flights of stairs but not long ones.  (Tr. at 54.)

5

Plaintiff testified that on a typical day he got up at about 9:00 and had coffee. He would sit in the kitchen until he got tired of sitting, then get up and walk around the kitchen. Sometimes he would go to the front room and watch television, nap or lie down. He stated that he engaged in no social activities and had no hobbies. (Tr. at 49, 53.) He testified that he could drive a car and did not need help dressing. (Tr. at 51, 53.) He said that he did a little housecleaning, dishes, and occasional cooking, but did not go food shopping. (Tr. at 53.)

Plaintiff also testified that he had problems with reading and writing. He stated that he knew how to write but did not know how to spell or sound out words. He indicated that he dropped out of high school during his junior year. He stated that he was unable to read and understand a newspaper or fill out a job application, and that his girlfriend had filled out the social security forms for him because he was unable to. (Tr. at 42-43.) He denied having been diagnosed with a learning disability as a child. (Tr. at 49.)

## C. Medical Evidence

On June 14, 1995, plaintiff underwent an MRI, which revealed degeneration of the third, fourth and fifth lumbar discs, with associated mild diffuse broad-based disc herniation at L5-S1 (Tr. at 121, 158, 161), and he subsequently received treatment for back pain at Orthopaedic Associates of Waukesha. During his initial exam by Dr. Shobe on June 26, 1995, plaintiff reported that his back pain started about a year ago without any known precipitating injury. The pain was mainly in the central low back area with occasional radiation down the right leg with numbness in his foot. The pain increased with standing, walking, coughing or sneezing, and was relieved by sitting. Plaintiff reported that in the past he had been treated by a Dr. Williams with anti-inflammatory medication and physical

6

therapy without relief. He reported that the pain was worsening but that he had not missed work. (Tr. at 151-53.)

On examination, plaintiff walked normally, his back was not tender to palpation, hyper-extension was 75% of normal without pain, and side bending and trunk rotation were unremarkable. (Tr. at 153.) He had normal motor and sensory function of the lower extremities, hip rotation was full, and sitting straight leg raising was negative bilaterally. Dr. Shobe's diagnosis was degenerative disc disease of the lumbar spine. He prescribed another course of physical therapy and Lodine, and scheduled a re-check in six weeks. (Tr. at 154, 155.)

Plaintiff's medication was refilled several times (Tr. at 152), and he returned for a re-check on November 29, 1995 reporting continued pain in the central portion of the lower back. However, there was "not much radiation of pain down the legs to speak of." (Tr. at 151.) Dr. Shobe recommended an exercise program and prescribed Naprosyn. (Tr. at 151.) The medication was again refilled in February and April 1996. (Tr. at 152.)

Plaintiff returned to Dr. Shobe on May 9, 1996, stating he still had pain in the central lower region of the back without radiation into the legs. He was not doing aerobic exercise or physical therapy (the latter because of scheduling problems with his job), which the doctor strongly encouraged him to do. Plaintiff was provided with a brochure containing exercises and advised to follow-up as his symptoms dictated. (Tr. at 150.)

On June 19, 1996, plaintiff saw Dr. Boehm at Medical Associates Health Centers for his back pain. The note indicated that plaintiff was seen two weeks previously and placed on Voltaren. Plaintiff stated that his pain was greatly reduced with the medication. He was advised to continue the medication and follow-up in several months. (Tr. at 166.)

7

Plaintiff did not returned to Dr. Boehm until June 5, 1998, when he was seen complaining of back pain and burning in his feet for the past month. It was noted that he was on Voltaren and had been doing well since starting this medication. The doctor ordered tests and prescribed Ultram for back pain. (Tr. at 165.)

Plaintiff returned to Dr. Boehm on December 8, 1999 for an upper respiratory infection, and his Voltaren was refilled.

Plaintiff next saw Dr. Boehm on June 8, 2000, complaining of lower back pain. On examination, he had no point tenderness of the lumbar spine and straight leg raising was negative bilaterally. Dr. Boehm's assessment was "lumbar strain," and he provided plaintiff with Flexeril and advised him to return in one week if not better. (Tr. at 122, 163.)

After filing his application for disability benefits in April 2001, plaintiff was examined by Dr. Jankus at the behest of the SSA on July 18, 2001. (Tr. at 103.) Plaintiff stated that he took medication for back pain, which helped partially. Plaintiff described his pain as 4 out of 10 in the morning, up to almost 10 out of 10 later in the day. He reported no complaints into the legs, though on questioning he did report occasional pain in the buttock and posterior thighs. He denied any sensation loss in the legs or bowel and bladder changes. He also reported a "popping" sensation in the left hip. (Tr. at 134.) Plaintiff stated that he could stand for about 45 minutes, walk three blocks and lift 20 pounds. He stated that out of an eight hour day he was on his feet five hours and sitting the other three. (Tr. at 134-35.)

On examination, Dr. Jankus noted mild flattening of the lumbar lordosis and mildly poor posture. On range of motion testing plaintiff reported pain at the end of range in all directions with forward flexion at 75 degrees, extension 20, and side bending 30 degrees

8

bilaterally. On palpation there was no tenderness of the lumbar spine or paraspinal region. Plaintiff had some mild prominence of several mid-lumbar spinous processes, suggesting degenerative changes. His hip, knee and ankle range of motion was intact. Strength was full in both lower extremities. Straight leg raising was negative for radicular complaints. (Tr. at 135.) His gait was somewhat forward slouched but there was no antalgic component. He had no weakness walking on heels or toes, and he was able to squat down and stand while holding onto the table for support. He was able to sit but pressed his elbows down on the arm rests providing some gravity traction for his low back. (Tr. at 136.)

Dr. Jankus's impression was chronic low back pain secondary to degenerative disc changes without radicular damage. (Tr. at 136.) Dr. Jankus sent plaintiff for an x-ray (Tr. at 136), which showed marked narrowing and degeneration of the L5-S1 disc. Prominent anterior osteophytes were present at this level. Otherwise, the lumbar area was normal. (Tr. at 137.)

On July 27, 2001, Dr. Chan prepared a physical RFC assessment for the SSA. He opined that plaintiff could occasionally lift 20 pounds, 10 pounds frequently; stand/walk and sit about six hours in an eight hour day; and push/pull in unlimited fashion. (Tr. at 139.) He further concluded that plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (Tr. at 140-42.) Dr. Callear reviewed and affirmed Dr. Chan's report on November 8, 2001. (Tr. at 145.)

On December 31, 2001, plaintiff returned to Dr. Boehm for recheck of his back pain. Plaintiff stated that he had not been working due to his back and lost his job about eight months ago; he brought a medical assessment for the doctor to complete regarding his

disability application.  On examination, there was no point tenderness of the vertebral bodies, and straight leg raise was slightly positive bilaterally.  Dr. Boehm prescribed Flexeril and Voltaren and advised plaintiff that he needed to see a specialist to obtain disability. (Tr. at 162.)

Plaintiff was then seen by James Ginter, PA under the supervision of Dr. Tjarksen, at Orthopaedic Associates of Waukesha, on August 22, 2002.  He complained of back pain since his 20s, worse over the past seven years.  He described it as constant, with associated bilateral leg pain and burning in his feet.  On examination, plaintiff was able to walk heel and toe without difficulty, and there was no tenderness to palpation of the back. He had full range of motion of the hip and straight leg raising was negative bilaterally.  He was provided with a six month sample of Celebrex, given a "back owner's manual" and shown exercises, and was to follow-up as needed.  (Tr. at 169.)  An x-ray taken on that date revealed significant disc space narrowing at L5-S1.  (Tr. at 160.)

On August 27, 2002, Dr. Tjarksen wrote a "To Whom It May Concern" letter in which he stated: "Mr. Knoll has a degenerative condition in his spine which makes it impossible for him to be gainfully employed in any position that requires prolonged bending or repetitive bending or lifting or twisting.  I suspect he would best be treated by applying for social services."  (Tr. at 149.)

**D.      ALJ's Decision**

On January 27, 2003, the ALJ issued an unfavorable decision.  (Tr. at 16.)  The ALJ concluded that plaintiff was not engaged in SGA; that he had severe impairments – spinal disc disorder, mild disc herniation and lumbar strain – but that none met or equaled a listed impairment; that he retained the RFC to perform light work with no repetitive bending, lifting

10

or twisting; that in light of that RFC plaintiff could not perform his past (medium) work; but that Grid Rule 202.11 supported a finding of not disabled at step five. (Tr. at 20-21.)

In making these findings, the ALJ considered the medical evidence and plaintiff's testimony. He found that plaintiff had received minimal treatment for back pain and that the objective medical evidence did not support the claim. (Tr. at 18.) The ALJ considered Dr. Tjarksen's August 27, 2002 letter, but noted that it was addressed "To Whom It May Concern" and did not say that plaintiff was precluded from all work activity, just that which involved prolonged postural movements. (Tr. at 19.) The ALJ further noted that plaintiff's claimed restrictions at the hearing were inconsistent with his statements to the consulting examiner and with his daily activities. (Tr. at 19.) Finally, the ALJ rejected the contention that plaintiff was illiterate, noting that plaintiff completed at least eight grades of school, never took special education classes, and in previous filings indicated that he could read and write more than his name in English. (Tr. at 19.)

## E.    Appeals Council Review

On February 3, 2003, plaintiff requested review by the Appeals Council. (Tr. at 11.) Along with a letter brief from counsel, he submitted an updated report from Dr. Tjarksen, which contained severe work restrictions, and educational records, which showed that he received poor grades. (Tr. at 188-92.) The Appeals Council denied review on October 22, 2004. (Tr at 5.) This action followed.

## III.  DISCUSSION

Plaintiff alleges that the ALJ: (1) relied on the Grid despite the existence of non-exertional limitations; (2) improperly evaluated his credibility; and (3) failed to develop the

11

record by obtaining literacy testing and re-contacting Dr. Tjarksen. I address each argument in turn.

## A.    Use of the Grid

The ALJ found that plaintiff retained the RFC to "perform work activity at the light exertional level with exertional limitations of standing or walking for six hours in an eight hour day, lifting up to twenty pounds and non-exertional limitations of no repetitive bending, lifting or twisting." (Tr. at 19-20.) In light of this RFC, the ALJ found that Grid Rule 202.11 supported a finding of not disabled.[2] (Tr. at 21.) Plaintiff argues that use of the Grid was improper because of the non-exertional postural limitations found by the ALJ.[3]

As noted above, the presence of non-exertional limitations may make reliance on the Grid improper. However, this does not mean that the presence of <u>any</u> non-exertional limitation renders the Grid inapplicable. Only where "a non-exertional limitation might substantially reduce a range of work an individual can perform [must the ALJ] consult a vocational expert." <u>Luna v. Shalala</u>, 22 F.3d 687, 691 (7th Cir. 1994); <u>Fast v. Barnhart</u>, 397 F.3d 468, 470 (7th Cir. 2005) ("Where a nonexertional limitation might substantially reduce

_____

[2]Under Rule 202.11, a person closely approaching advanced age (50-54), limited to light work, with limited education or less, previously holding skilled or semi-skilled employment but with no transferable skills, is not disabled.

[3]The ALJ included plaintiff's inability to "repetitively" lift among the non-exertional limitations, but lifting falls in the exertional category. <u>See</u> SSR 83-10 (defining exertional activity as "the primary strength activities (sitting, standing, walking, lifting, carrying, pushing, and pulling"). This appears to have been a typographical error or other oversight by the ALJ, since he properly included plaintiff's ability to lift up to 20 pounds in his exertional findings. Further, plaintiff does not argue that the ALJ erred in finding him capable of light work under Grid Rule 202.11 in light of any limitation on "repetitive" lifting. Rather, he argues that use of the Grid was improper in light of his non-exertional limitations.

12

the range of work an individual can perform, use of the grids is inappropriate and the ALJ must consult a VE."). Thus, the question in the present case is whether plaintiff's non-exertional limitations substantially reduced his ability to perform a full range of light work.

SSR 83-10 sets forth the requirements of light work:

The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

SSR 83-10 (emphasis added).

Thus, light work requires only "occasional" stooping. "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10. The ALJ's RFC determination restricted plaintiff from "repetitive" bending or twisting, but light work does not require such an ability. See SSR 83-14 ("[T]o perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time,

13

depending on the particular job)."); SSR 85-15 ("If a person can stoop occasionally (from very little to up to one third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact."). Thus, these non-exertional limitations did not substantially reduce the range of light work, and the ALJ did not err in using the Grid. See, e.g., Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 525 (1st Cir. 1989) (finding that restriction of "occasional" bending did not significantly reduce the light occupational base); Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (finding that ALJ did not err in using the Grid where claimant could not do "repeated" bending because "such a restriction would have very little effect on the ability to perform the full range of work at either the light or sedentary level").

In his reply brief, plaintiff argues that the ALJ failed to acknowledge the potential effect of the postural limitations when applying the Grid, and the contention that such limitations would only minimally erode the light work base is an impermissible post-hoc refinement of the decision. However, because it is clear that these non-exertional limitations do not preclude light work, the ALJ's failure to state that explicitly was, at most, harmless error. See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Plaintiff further argues that the regulations cited above do not describe how often one must "twist" to perform light work. However, plaintiff cites no authority for the proposition that twisting should be treated differently than other postural activities such as

14

bending, stooping or crouching, and the cases suggest that it should not. See, e.g., Johnson v. Comm'r of Soc. Sec., 97 Fed. Appx. 539, 542 (6th Cir. 2004) ("Light work does not include repetitive twisting, bending or jarring movement."); Howerton v. Barnhart, No. 03-1191, 2003 U.S. App. LEXIS 19334, at *2 (8th Cir. Sept. 18, 2003) (affirming ALJ's finding that claimant "retained the capacity for light work activity without any significant nonexertional limitations" where treating physician "released him to return to light to moderate work activity, with restrictions only against 'heavy' lifting, twisting, or bending"); Warda v. Apfel, No. 99-CV-00554, 2000 U.S. Dist. LEXIS 11489, at *12 (N.D. Ill. June 26, 2000) ("Dr. Young prohibited work involving 'heavy lifting and repetitive bending and twisting' and the definition of light work does not involve this. The definition of light work has specific weight lifting limitations and is inclusive of jobs that do not include bending and twisting. Therefore, the ALJ properly concluded that the Plaintiff can perform light work.").[4]

Therefore, for all of these reasons, plaintiff's first assignment of error is rejected.

**B.      Credibility**

The ALJ acknowledged plaintiff's complaints of constant pain, difficulty sleeping and lack of relief from physical therapy. (Tr. at 18.) However, he found plaintiff's testimony not fully credible, citing the lack of objective medical evidence supporting the testimony, the lack of treatment for pain, the relatively normal physical examinations, the contradictory

---

[4]Plaintiff also contends in his reply brief that the ALJ failed to consider other non-exertional limitations, including the speed with which he could walk from one place to another and his illiteracy. Walking is an exertional activity, SSR 83-10, and thus a limitation on it would not preclude use of the Grid. Further, plaintiff cites no evidence demonstrating that his gate was so slow that he could not perform light work. Finally, plaintiff failed to raise this argument in his primary brief and thus waived it. See Damato v. Sullivan, 945 F.2d 982, 988 n.5 (7th Cir. 1991) (stating that arguments raised for the first time in a reply brief are waived). I address literacy later in this decision.

statements to consulting examiner Dr. Jankus, and plaintiff's activities of daily living. (Tr. at 18-19.)

Plaintiff argues that the ALJ erred by primarily relying on lack of treatment. He admits that the record contained little evidence of treatment. However, he states that he tried therapy without relief, then ended up returning to work. He states that, because he had to continue to work to support himself, he adapted his movements to accommodate the pain, until he became too slow and was laid off due to poor performance. He states that once he was terminated he no longer had health insurance and could not afford treatment, and that an inability to afford treatment should not result in a denial of benefits. He contends that his claimed restrictions were consistent with those given by Dr. Tjarksen and for someone suffering from degenerative disc disease. He argues that the ALJ was not free to discount these restrictions given no inconsistencies in the record.

Generally, the court must defer to the ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing. Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). Nevertheless, while the ALJ's conclusion as to the claimant's credibility must be afforded great deference by a reviewing court, the manner in which he reaches that conclusion is highly regulated. Schwabe v. Barnhart, 338 F. Supp. 2d 941, 955 (E.D. Wis. 2004). Specifically, the ALJ must comply with SSR 96-7p in evaluating credibility. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003); Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003). That Ruling provides, in pertinent part:

16

In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p. Further,

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7p; see also Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) ("The cases make clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony.").

SSR 96-7p establishes a two step process for evaluating symptoms, such as pain, fatigue or weakness. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If there is no medically determinable

17

physical or mental impairment, or if such impairment could not reasonably be expected to produce the claimant's pain or other symptoms, the symptoms cannot be found to affect the claimant's ability to do basic work activities.  SSR 96-7p.

Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to perform basic work activities.  If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.  SSR 96-7p.

At step two, "the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  Rather, this is but one factor to consider, along with 1) the claimant's daily activities; 2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  Id. (citing 20 C.F.R. § 404.1529(c)(3)); SSR 96-7p.  While SSR 96-7p does not require the ALJ to analyze and elaborate on each of the seven factors when

18

making a credibility determination, he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004).

The ALJ's credibility finding in the present case substantially complied with these requirements, was supported by substantial evidence, and thus was not "patently wrong." First, the ALJ did not reject plaintiff's testimony solely because it was not supported by the objective medical evidence (though that was part of his explanation). The ALJ also discussed other factors under SSR 96-7p, including the location, duration, frequency and intensity of plaintiff's pain (Tr. at 18); the lack of strong pain medication or side effects of medication (Tr. at 18, 19); the limited treatment plaintiff had received (Tr. at 18); and plaintiff's daily activities (Tr. at 19). The ALJ further noted that plaintiff's claim that he stopped therapy because it did not help was contradicted by his prior statement that he did not follow through with therapy due to his work schedule (Tr. at 18; 150), and that plaintiff reported greater exertional abilities to Dr. Jankus than he testified to at the hearing (Tr. at 19; 134-35).

Second, although the cases suggest that limited treatment alone would be insufficient to find a claimant's testimony about pain incredible, the cases certainly do not hold that this is an illegitimate basis for questioning a claimant's assertions. See, e.g., Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("The ALJ is permitted to consider lack of treatment in his credibility determination."); Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (upholding credibility determination based on lack of consistent medical treatment, physician's opinion that claimant was disabled, objective medical evidence in

19

support of his allegations of pain, and evidence that his condition deteriorated, as well as claimant's performance of daily activities that were inconsistent with his allegations). In the present case, the ALJ's finding that the objective medical evidence did not support plaintiff's testimony was supported by substantial evidence. As the ALJ noted, plaintiff had one appointment for back pain in June 2000 and then did not require another until December 2001. He was not again seen until August 2002. (Tr. at 18; 122, 162, 169.) Further, when plaintiff was seen, his doctors were unable to locate objective signs supporting his later testimony; instead, he consistently demonstrated full range of motion; normal motor strength, flexion and reflexes; and no point tenderness along the lumbar spine. (Tr. at 18; 122, 135, 136, 163, 169.)

Third, "although plaintiff is correct that the ALJ may not discredit [him] for a lack of treatment or aggressive testing when . . . [he] has a legitimate reason for [failing] to get additional treatment, such as lack of funds, the determinative factor here is that there is no indication in the administrative record that plaintiff has ever been diagnosed with a back problem that required any form of extensive evaluation or treatment." Branum v. Barnhart, 385 F.3d 1268, 1274 (10th Cir. 2004) (internal citations and quote marks omitted). Further, plaintiff's irregular treatment occurred both before and after he lost his job and insurance.

Fourth, the ALJ did not unreasonably fail to consider Dr. Tjarksen's August 27, 2002 letter in evaluating plaintiff's limitations. In that letter, the doctor opined that plaintiff could not work "in any position that requires prolonged bending or repetitive bending or lifting or twisting." (Tr. at 149.) The ALJ incorporated these restrictions into his RFC finding. It was only after the ALJ issued his decision that Dr. Tjarksen wrote a letter imposing more specific (and restrictive) limitations. (Tr. at 201.) "[T]the court may not consider evidence

20

first presented to the Appeals Council in deciding whether the administrative law judge made an error of fact, because he cannot err by failing to have considered evidence never tendered to him." Keys, 347 F.3d at 993.

Thus, I conclude that there was substantial evidence supporting the ALJ's conclusion and that he properly explained his credibility finding.

In his reply brief, plaintiff notes that there was objective evidence supporting his claims – the 1995 MRI showing degenerative disc disease – and that this condition could be expected to worsen and cause pain. However, the ALJ accepted that plaintiff had a severe condition at step one of the SSR 96-7p evaluation process; it was at the second step that the ALJ found, in light of the entire record, that plaintiff's testimony of disabling symptoms was "not fully credible." (Tr. at 21.) In conducting this analysis, it was appropriate for the ALJ to consider lack of treatment and positive medical findings. In any event, the issue for a reviewing federal court is not whether there is substantial evidence supporting an alternative finding that the ALJ did not make but rather whether substantial evidence supports the conclusions the ALJ did reach. See Scheck, 357 F.3d at 699 ("[T]he ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence.").[5]

------

[5]Plaintiff also argues that some of the inconsistencies in his statements can be attributed to the fact that he is an older man with limited intellectual functioning. This may be one reasonable explanation but it is certainly not the only one. Under the circumstances, this was an issue for the ALJ to decide, and it is not the role of the reviewing federal court to substitute its judgment for that of the ALJ. See, e.g., Jens, 347 F.3d at 212 ("To determine if substantial evidence exists, the court reviews the record as a whole but is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.") (internal quote marks omitted).

21

Plaintiff further contends that Dr. Tjarksen found his complaints credible and considered further diagnostic testing unnecessary. However, credibility is an issue for the Commissioner to decide based on the entire record. Further, the record shows that Dr. Tjarksen did order an x-ray. (Tr. at 160.) Finally, while it is true that, as plaintiff notes, the ALJ did not mention the observation of the SSA employee who took plaintiff's application that plaintiff "looked and walked much older than [his] chronological age" and "walked slowly and slightly hunched over," (Tr. at 95), the ALJ need not address every piece of evidence in the record so long as his analysis is sufficient to assure the reviewing court that he considered the important evidence and to enable the court to trace the path of his reasoning. Johansen v. Barnhart, 314 F.3d 283, 287 (7th Cir. 2002); Sims v. Barnhart, 309 F.3d 424, 429 (7th Cir. 2002); Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996). The ALJ's decision in the present case was sufficient under this standard.

In sum, I find no reversible error in the ALJ's credibility determination. Indeed, this case is much like Schmidt v. Barnhart, 395 F.3d 737, 746-47 (7th Cir. 2005), in which the Seventh Circuit recently affirmed an ALJ's credibility determination:

> Schmidt contends that the ALJ improperly evaluated his testimony concerning subjective complaints of pain by failing to consider the relevant factors outlined in 20 C.F.R. § 404.1529, Social Security Ruling 96-7p, and our decisions including Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995); Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003); and Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from "merely ignoring" the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding. See Lopez, 336 F.3d at 539; Knight, 55 F.3d at 314.
>
> The ALJ's assessment of Schmidt's credibility did not run afoul of the applicable analytical framework. The decision notes not only the absence

22

of objective medical evidence to support the severity of the pain to which Schmidt testified, but goes on to consider that Schmidt's daily living activities were not significantly restricted, that he was not receiving any active treatment or therapy for his conditions at the time of the hearing, that he was not using any prescription medication, and that his alleged pain did not prevent him from engaging in substantial gainful activity for several months after he allegedly became disabled.  By considering these factors and explaining how they factored into his credibility analysis, the ALJ properly followed the requirements for evaluating the credibility of a claimant's subjective complaints.  Further, we find that the ALJ's conclusions in this regard are supported by substantial record evidence.  Schmidt's contentions to the contrary are nothing more than a rehash of the medical records that do not point to any specific evidence contradicting the ALJ's conclusions.  In the end, we conclude that the ALJ's credibility determination is not patently wrong, is supported by substantial evidence, and is sufficiently detailed that we are able to trace its path of reasoning.  See Knight, 55 F.3d at 315; Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001).

Therefore, plaintiff's second assignment of error is rejected.

## C.    Development of the Record

### 1.    Literacy

The ALJ acknowledged plaintiff's claim that he was functionally illiterate.  However, he noted plaintiff's testimony that he attended high school for six months as a junior and never took special education classes.  The ALJ further noted plaintiff's statements in his application materials that he could read English, write more than his name in English, completed eight grades of school, and was not in special education classes.  Therefore, he concluded that plaintiff was literate.  (Tr. at 19.)

Plaintiff argues that the ALJ erred in his evaluation of, and failed in his duty to develop the record on, this issue.  He states that the ALJ was advised that he would testify as to his illiteracy, that the ALJ chose to reject the claim without further developing the record, and that the ALJ was not free to do so without inconsistent facts in the record.

23

The issue of plaintiff's literacy was highly significant in this case.  Under the Grid, a person closely approaching advanced age (50-54) and limited to light work, who is unable to perform his past work and has no transferable skills, and "is further significantly limited by illiteracy or inability to communicate in English" is considered disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(d).  A person with all of these characteristics, but who is literate (even if he has limited education or less), is not disabled.  Id. § 202.11.[6]

Under SSA regulations, "Illiteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling."  20 C.F.R. § 404.1564(b)(1).  As the Seventh Circuit has noted:

> For the severely functional purpose of identifying a class of workers with negligible employment opportunities, the standard for literacy has been pitched quite low, and appropriately so; for the question is only whether the applicant is so deficient in ability to read and write that he cannot obtain even an unskilled job.

Glenn v. Sec'y of Health & Human Servs., 814 F.2d 387, 391 (7th Cir. 1987).

Although the regulations set the bar low, they do not set the height with precision.  The ability to sign one's name does not equal literacy, and a person "can be illiterate even if [he] had a significant amount of formal schooling (it may not have taken)."  Id. at 389-90.  Thus, in situations such as this,  ALJs often must make judgment calls, and courts must respect those calls so long as they are reasonable and supported by substantial evidence.  See id. at 391.

---

[6]This is the Rule relied upon by the ALJ in rejecting plaintiff's claim.

24

Under this deferential standard, I find that the ALJ's decision was sufficient. First, both plaintiff's testimony and his application materials showed that plaintiff had at least eight years of schooling. Thus, it was undisputed that he had a "limited education." 20 C.F.R. § 404.1564(b)(3) ("Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."). Even one with "marginal education," 20 C.F.R. § 404.1564(b)(2) ("Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education."), is considered "not disabled" under Rule 202.11.

Second, while other evidence may overcome the presumption that one with limited education can read and write, the ALJ found that such evidence was not presented in this case. Plaintiff relied solely on his own testimony on this issue. He and counsel had the following exchange:

Q.    Do you have problems with reading and writing?

A.    Yes. I do.

Q.    Okay. What are those problems.

A.    I don't know how to write. Well, I know how to write, but I don't know how to spell or sound the words out or anything like that.

Q.    Okay. How far did you actually go in school?

A.    I actually went just maybe six months. I was a junior in high school.

25

Q.     And are you able to, let's say, read the newspaper to know what's going on?

A     No.

Q     When you filled out job applications in the past, did you do that or did someone else?

A     Someone else.

Q     When you filled out the various forms that have been filed with Social Security, did you fill those out or someone else?

A     Someone else did.

Q     And who filled those out for you?

A     My roommate or girlfriend, Sue Schroeder.

Q     And why did she fill them out for you again?

A     Because I didn't know how to fill them out or read.

(Tr. at 42-43.)

Despite this testimony, it was not unreasonable for the ALJ to find plaintiff literate in light of plaintiff's statements in his application materials that he could read and write, had completed eight grades of school, and had not attended special education classes.  (Tr. at 83, 90.)  It is true that plaintiff testified he did not personally complete those forms,[7] but he did not indicate that anything in them was inaccurate.  Even setting aside the discrepancy with the application forms and accepting plaintiff's testimony at face value, that testimony did not establish illiteracy under SSA regulations, which require only the ability to "read or write a simple message."  Plaintiff's inability to read and understand a

---

[7]In his daily activities questionnaire, plaintiff wrote that he needed help completing the form because he could not read or write "very well."  (Tr. at 111.)

26

newspaper or job application, or spell accurately does not make him illiterate. <u>Starks v.</u> <u>Bowen</u>, 873 F.2d 187, 189-90 (8th Cir. 1989) (affirming finding that claimant was literate despite his inability to read and understand a newspaper or job application); <u>Glenn</u>, 814 F.2d at 390 (affirming finding that claimant was literate despite his inability to read a newspaper). Neither does his inability to comprehend the SSA's forms. <u>Glenn</u>, 814 F.2d at 390 (finding claimant literate despite his inability to read the SSA's notice of hearing).[8]

Plaintiff was represented at his hearing, and counsel made no effort to demonstrate that plaintiff could not comprehend the directions required for typical, unskilled, light work. "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." <u>Glenn</u>, 814 F.2d at 391. In sum, as plaintiff admits in his brief, he did "go to school and acquired limited ability to read and write." (Plt. Brf. at 7.) That is all the regulations require.[9]

However, plaintiff argues that the ALJ should have ordered testing on plaintiff's literacy. Prior to the hearing, plaintiff's counsel wrote the ALJ and advised him that she "found Mr. Knoll is incapable of reading and writing at a functional level. . . . It is unclear to me whether Mr. Knoll's difficulties result from a lack of education or other

---

[8]The record also contains evidence that plaintiff was required to write reports as part of his welding job. (Tr. at 85.)

[9]In his reply brief, plaintiff argues that the ALJ failed to discuss his "degree" of literacy, which should have been considered when evaluating his mental ability as a non-exertional impairment. Plaintiff cites no authority for the proposition that the ALJ was required to do so. Literacy is defined in 20 C.F.R. § 404.1546(b)(1) as the ability to "read or write a simple message." Any degree of literacy above that very basic level would seem to make no difference under the applicable Grid Rule. Further, there was no evidence that plaintiff suffered from any other mental impairment.

27

cognitive/neurological factors."  She therefore believed it "appropriate to alert the social security administration to this 'vocational' factor in the event social security would like claimant to undergo testing as to this issue."  (Tr. at 120.)

A social security claimant bears the burden of supplying adequate records and evidence to prove his claim of disability.  Scheck, 357 F.3d at 702.  However, because disability proceedings are non-adversarial, the ALJ also has a duty to ensure that the record is fully and fairly developed, even when the claimant is represented by counsel. Elbert, 335 F. Supp. 2d at 905 (citing Hawkins v. Chater, 113 F.3d 1162, 1164, 1168 (10th Cir. 1997); Luna v. Massanari, No. 00-1075, 2001 U.S. Dist. LEXIS 13117, at *18 (S.D. Ind. July 18, 2001)).  This may require the ALJ to consult medical advisors or order a medical or psychological examination or testing.  Id. (citing Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004)).  "Nevertheless, because the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant, and 'because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected.'"  Id. (quoting Flener, 361 F.3d at 444); see also Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993) ("How much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment.").  The claimant cannot force the ALJ to order an examination or testing, and the court will reverse an ALJ's refusal only when such testing is necessary for an informed decision.  Elbert, 335 F. Supp. 2d at 906; see also Birnell v. Apfel, 45 F. Supp. 2d 826, 835 (D. Kan. 1998) (stating that the pertinent inquiry is whether the record contained sufficient information for the ALJ to make an informed decision as to the claimant's alleged mental impairment without the need for a consultative

psychological exam).  When counsel clearly raises the issue, the court may more critically review the ALJ's failure to order an examination.  <u>Elbert</u>, 335 F. Supp. 2d at 906 (citing <u>Hawkins</u>, 113 F.3d at 1168-69).

In <u>Elbert</u>, I reversed an ALJ's decision and remanded for psychological and intelligence testing.  However, Elbert presented far more evidence than plaintiff did.  Elbert alleged that she suffered from depression and severely limited intellectual functioning, and at the hearing her lawyer specifically requested that the ALJ to obtain a psychological evaluation with intelligence testing.  <u>Id.</u> at 907.  Elbert presented evidence from four sources.  First, she submitted a treatment note indicating that she felt depressed for months, that she used to see a psychiatrist, and containing a recommendation that she do so again.  Second, Elbert testified that she had not completed high school; was "slow" in school and did not understand her assignments; did not read or write well; did not have a driver's license because she could not pass the test; had trouble understanding how to wrap the sandwiches when she worked at McDonald's and how to cut boxes at one of her temporary work assignments; paid her bills in cash, with her landlord's help, and never had a checking account; had seen a psychiatrist in the past; cried every day or every other day, and wished she was dead; and sat alone in her house in the dark every day.[10]  Third, Elbert's son testified that she liked to stay isolated in the house, was slower than other people, and did not communicate "on a regular level."  Fourth, Elbert submitted a high school transcript, which indicated that her grades were poor.  <u>Id.</u> at 907.  Based on this

---

[10]The ALJ found Elbert not fully credible, but I reversed that determination.  <u>Id.</u> at 909-11.

Case 2:04-cv-01122-LA   Filed 04/18/05   Page 29 of 33   Document 18

combination of evidence, I concluded that – although the issue was close[11] – the ALJ erred by rejecting plaintiff's claim without further testing.  Id. at 914-15.

In the present case, plaintiff relied solely on his own testimony before the ALJ, which the ALJ reasonably found not fully credible.  He presented no corroborating documentary or testimonial evidence.  See Howell v. Sullivan, 950 F.2d 343, 349 (7th Cir. 1991) (affirming ALJ's refusal to obtain consultative examination where claimant relied on his and his wife's testimony, presenting no objective evidence).  He did present a transcript to the Appeals Council, but I cannot consider it in evaluating the ALJ's decision.  See Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004) ("Because the Appeals Council eventually refused Rice's request to review the ALJ's unfavorable decision, we note that it is not appropriate for us to consider evidence which was not before the ALJ, but which Rice later submitted to the Appeals Council (or any argument based upon such evidence.").  Thus, I cannot conclude that the ALJ erred in declining plaintiff's pre-hearing suggestion that further testing be ordered.[12]

---

[11]Indeed, I later denied Elbert's request for attorney's fees, finding that the Commissioner's position on this issue was "substantially justified."  Elbert v. Barnhart, No. 04-C-43 (E.D. Wis. Oct. 28, 2004) (decision on EAJA motion).

[12]I note that plaintiff did not specifically request testing in the pre-hearing letter from counsel and did not mention the issue at all during the hearing.  I also note that, to the extent plaintiff argues the ALJ should have asked more questions on this issue at the hearing, plaintiff was represented by counsel, and so "the administrative law judge [was] entitled to assume that [he was] making his strongest case for benefits."  Glenn, 814 F.2d at 391.

30

### 2. Treating Source/Light Work

Plaintiff also argues that there was no evidence that he was capable of light work, and that the ALJ should have contacted Dr. Tjarksen to obtain clarification of the vague restrictions contained in Tjarken's August 27, 2002 letter. His argument fails.

First, contrary to plaintiff's suggestion, there was evidence that plaintiff could perform light work. The state agency medical consultants so found, and the ALJ accepted their opinions, with the added postural restrictions from Dr. Tjarksen. (Tr. at 20; 149.) Further, as the ALJ also noted, plaintiff essentially reported the ability to perform work at the light level to examining consultant Dr. Jankus. (Tr. at 19; 134-35.) Plaintiff points to no medical evidence that was before the ALJ demonstrating inability to work at the light level.

Second, I cannot conclude that the ALJ erred in failing to contact Dr. Tjarksen for clarification.

> The regulations and rulings require an ALJ to contact a treating physician before rejecting his or her opinion under two circumstances: (1) when the evidence from the treating physician or other medical source is inadequate for [the Administration] to determine whether [the claimant is] disabled, 20 C.F.R. § 404.1512(e), and (2) when the treating source provides an opinion on an issue reserved to the Commissioner and the basis for the opinion is not clear, SSR 96-5p, 1996 WL 374183, at *6.

Kilps v. Barnhart, 250 F. Supp. 2d 1003, 1014 (E.D. Wis. 2003) (internal quote marks omitted); see also SSR 96-2p. I first note that it is questionable whether Dr. Tjarksen qualified as a treating source.

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical

Case 2:04-cv-01122-LA   Filed 04/18/05   Page 31 of 33   Document 18

evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. 404.1502. Plaintiff had seen Dr. Tjarksen just once at the time of the hearing,[13] and that appointment occurred after plaintiff had applied for benefits and was told by his treating physician to see a specialist to have disability paperwork completed. (Tr. at 162.) In any event, while not resolving the issue of whether Dr. Tjarksen was a treating source, the ALJ considered his opinion (Tr. at 19) and incorporated the listed restrictions into the RFC determination (Tr. at 20).[14] Finally, Dr. Tjarksen did not opine on an issue plainly reserved to the Commissioner. Thus, the ALJ was not required to contact Dr. Tjarksen.[15]

Therefore, for all of these reasons, I cannot conclude that the ALJ unreasonably failed to develop the record or erred in his evaluation of plaintiff's literacy and RFC, and plaintiff's third assignment of error is rejected.

---

[13]Actually, plaintiff was seen by PA Ginter under Dr. Tjarksen's supervision.

[14]Because the ALJ adopted Dr. Tjarksen's restrictions, there is no need to address plaintiff's contention that the ALJ should have afforded his opinion greater weight than those of the SSA's consultants.

[15]As plaintiff notes, he did present a letter from Dr. Tjarksen to the Appeals Council that contained more specific restrictions. However, as indicated, I may not consider such evidence in determining whether the ALJ erred. Rice, 384 F.3d at 366 n.2.

32

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.[16]

Dated at Milwaukee, Wisconsin, this 18th day of April, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[16]In her response brief, the Commissioner argues that a sentence six remand to consider the evidence plaintiff first submitted to the Appeals Council would not be appropriate.  In his reply, plaintiff disavows any desire for a sentence six remand.  Rather, he states that this evidence was submitted to the Council to support his argument that the ALJ improperly discounted or misinterpreted the evidence before him.  However, plaintiff does not argue that the Appeals Council erred in declining to review the case, so I may not consider the evidence first submitted to the Council.  See Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995) ("We have held that, when the Appeals Council has denied review, evidence submitted for the first time to the Council, though technically a part of the administrative record, cannot be considered in determining the correctness of the ALJ's decision. . . . Although we may conduct a limited review of the newly submitted evidence when a claimant alleges that the Appeals Council's refusal to review the ALJ's decision is based on a mistake of law, Mr. Diaz makes no such allegation on appeal. . . . Therefore, we shall consider only the evidence that was before the ALJ.").

33